**United States District Court**
For the Northern District of California

1

2                                                    *E-FILED 09/17/2009*

3

4

5

6

7                                        NOT FOR CITATION

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                        SAN JOSE DIVISION

11   PIOTR J. GARDIAS,                           No. C07-06242 HRL

12            Plaintiff,                          **ORDER GRANTING DEFENDANT'S**
                                                 **MOTION FOR SUMMARY JUDGMENT**
13       v.

14   THE CALIFORNIA STATE UNIVERSITY,
     SAN JOSE STATE UNIVERSITY,
15                                                **[Re: Docket No. 45]**
              Defendant.
16   _____/

17       Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title

18   VII"), pro se plaintiff Piotr J. Gardias sues for alleged employment discrimination.  Defendant

19   The Board of Trustees of the California State University[1] moves for summary judgment.

20   Gardias opposes the motion.  Upon consideration of the moving and responding papers, as well

21   as the arguments presented at the motion hearing, this court grants the motion.[2]

22                                        **I.  BACKGROUND**

23       Since 1989, Gardias has been employed by the California State University system at the

24   San Jose State University ("SJSU" or "University") campus.  He works in the Facilities

25   Development and Operations ("FDO") department as a Building Service Engineer – the

26

27       [1]     Defendant says that it was erroneously sued as "California State University"
     and "San Jose State University."

28       [2]     Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have
     expressly consented that all proceedings in this matter may be heard and finally adjudicated
     by the undersigned.

1  position he has held for most of his employment at the University, and the one he continues to

2  hold today.  This is a skilled trade position involving the operation, maintenance, inspection and

3  repair of the ventilation, heating and water systems on campus.

4        From plaintiff's perspective, his employment at the University has not gone smoothly.

5  Gardias contends that for the last decade or so, he has been the victim of persistent, pervasive

6  employment discrimination.  The total number of employment actions he has filed against the

7  University is unknown, but the undersigned has (or had) eight of them.  The suit at issue here is

8  number six.[3]  In this lawsuit, Gardias alleges that defendant failed to promote him and

9  committed other acts as follows:  (1) "Denying me work according to my Job Description"; (2)

10  "Denying me electric cart for my work"; (3) "Denying me use of the EMS [Energy

11  Maintenance System] for my work"; and (4) "Harassment and retaliation."  (Complaint at 2,

12  Docket No. 1).  He claims that defendant's conduct is discriminatory with respect to his national

13  origin (Polish).  He also claims that defendant's conduct violates "Title VII the Americans with

14  Disabilities Act, and/or the Age Discr. in Emp. Act and Equal Pay."  (Id.).[4]  The alleged

15  discrimination is said to have occurred between May 30, 2007 and November 30, 2007.  (Id.).

16        Defendant now moves for summary judgment on the following grounds:  (1) defendant

17  enjoys Eleventh Amendment immunity as to Gardias' age discrimination claim; (2) plaintiff

18  failed to administratively exhaust his disability discrimination/denial of electric cart claim; (3)

19  plaintiff cannot establish a triable issue as to the elements of a *prima facie* case of employment

20  discrimination; (4) plaintiff cannot establish a triable issue as to the elements of a claim for

21

22

23     [3]    The first five suits (Case Nos. C04-04086, C04–04768, C05-01242, C05-01833 and C06-04695), which this court consolidated, alleged discriminating actions

24  spanning, generally, the time period 2001 to 2006.  The court ultimately granted summary judgment in favor of defendant.  The seventh action, covering January 2008 to November 2008, resulted in a judgment of dismissal for defendant.  The eighth action is still pending.

25

26     [4]    Gardias apparently intended to reference the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., the Age Discrimination in Employment Act

27  ("ADEA"), 29 U.S.C. § 621, et seq., and the Equal Pay Act of 1963, 29 U.S.C. § 206.  His claims under the ADA and ADEA are addressed below.  With respect to the Equal Pay Act, plaintiff does not allege facts or present evidence as to any violation.  Accordingly, to the

28  extent plaintiff intended to assert a claim under that statute, this court finds no triable issue here and grants defendants' summary judgment as to that claim.

United States District Court
For the Northern District of California

1    retaliation or harassment; and (5) plaintiff's complaint raises no justiciable claim as to

2    statements made in connection with plaintiff's prior lawsuits against the University.

## II.  LEGAL STANDARD

4          A motion for summary judgment should be granted if there is no genuine issue of

5    material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.

6    56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears

7    the initial burden of informing the court of the basis for the motion, and identifying portions of

8    the pleadings, depositions, answers to interrogatories, admissions, or affidavits which

9    demonstrate the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

10   317, 323 (1986).  In order to meet its burden, "the moving party must either produce evidence

11   negating an essential element of the nonmoving party's claim or defense or show that the

12   nonmoving party does not have enough evidence of an essential element to carry its ultimate

13   burden of persuasion at trial."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.,

14   210 F.3d 1099, 1102 (9th Cir. 2000).

15         If the moving party meets its initial burden, the burden shifts to the non-moving party to

16   produce evidence supporting its claims or defenses.  See FED. R. CIV. P. 56(e)(2); Nissan Fire &

17   Marine Ins. Co., Ltd., 210 F.3d at 1102.  The non-moving party may not rest upon mere

18   allegations or denials of the adverse party's evidence, but instead must produce admissible

19   evidence that shows there is a genuine issue of material fact for trial.  See id.  A genuine issue

20   of fact is one that could reasonably be resolved in favor of either party.  A dispute is "material"

21   only if it could affect the outcome of the suit under the governing law.  Anderson, 477 U.S. at

22   248-49.

23         "When the nonmoving party has the burden of proof at trial, the moving party need only

24   point out 'that there is an absence of evidence to support the nonmoving party's case.'"

25   Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at

26   325).  Once the moving party meets this burden, the nonmoving party may not rest upon mere

27   allegations or denials, but must present evidence sufficient to demonstrate that there is a

28   genuine issue for trial.  Id.

**United States District Court**
For the Northern District of California

**III.  DISCUSSION**

**A.  <u>Plaintiff's Age Discrimination Claims</u>**

Defendant contends that it is entitled to summary judgment as to plaintiff's age discrimination claims because those claims are barred by the Eleventh Amendment.  Plaintiff argues that this court properly may adjudicate his age discrimination claims because he is a United States citizen.  (Opp. at 22).[5]

The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  It "has been interpreted to shield States from suits by individuals absent the State's consent."  <u>Wells v. Bd. of Trustees of the California State Univ.</u>, 393 F.Supp.2d 990, 995 (N.D. Cal. 2005) (citing <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 54, 116 S. Ct. 1114, 134 L.Ed.2d 252 (1996)).  "The same immunity also applies to state agencies."  <u>Hibbs v. Dep't of Human Resources</u>, 273 F.3d 844, 850 (9th Cir. 2001) (citing <u>Fla. Dep't of State v. Treasure Salvors, Inc.</u>, 458 U.S. 670, 684, 102 S. Ct. 3304, 73 L.Ed.2d 1057 (1982)).

The Age Discrimination in Employment Act ("ADEA") "is the exclusive remedy for claims of age discrimination in employment, even those claims with their source in the Constitution."  <u>Ahlmeyer v. Nevada Sys. of Higher Education</u>, 555 F.3d 1051, 1060-61 (9th Cir. 2009).  The United States Supreme Court has held that the ADEA did not abrogate the states' Eleventh Amendment immunity from suit by private individuals.  <u>Kimel v. Florida Bd. of Regents</u>, 528 U.S. 62, 92, 120 S. Ct. 631, 145 L.Ed.2d 522 (2000).  "Nothing in <u>Kimel</u> suggests that the Court intended to remove the statutory jurisdictional basis for age discrimination suits against a state or its agencies."  <u>Katz v. Regents of the Univ. of California</u>, 229 F.3d 831, 834

---

[5]      Plaintiff's opposition consists of approximately 200 pages.  Only the first several pages are consecutively numbered.  The remainder of his submission are pages of his opposition brief interspersed with numerous and sundry exhibits.  The court has endeavored to identify as specifically as possible the portions of his papers being cited (with the caveat that a citation to a numeric page does not necessarily correspond to the place where the page actually appears in Gardias' papers).  In some instances, however, the court found itself unable to cite to his papers with anything more than a general citation to his opposition.

United States District Court
For the Northern District of California

1    (9th Cir. 2000).  Nonetheless, "on account of Eleventh Amendment immunity the states can not

2    be compelled to submit to the jurisdiction of the federal courts in such suits."  Id.[6]

3         Defendant is an arm of the state entitled to claim Eleventh Amendment immunity.  See

4    Stanley v. Trustees of the California State University, 433 F.3d 1129, 1133 (9th Cir. 2006)

5    ("We have previously held that the Trustees [of the California State University] are an arm of

6    the state that can properly lay claim to sovereign immunity.") (citing Jackson v. Hayakawa, 682

7    F.2d 1344, 1350-51 (9th Cir. 1982)); see also Wells, 393 F. Supp.2d at 995 (same).  On the

8    record presented, there is no indication that defendant has expressly waived that immunity.  See

9    Aholelei v. Dep't of Public Safety, 488 F.3d 1144, 1148-49 (9th Cir. 2007) (holding that, even

10   where the state defendants filed a third-party complaint, they did not waive their Eleventh

11   Amendment immunity defense as to plaintiff's claims where the defense was promptly asserted

12   in their answer, was never expressly waived, and subsequently was litigated on summary

13   judgment).

14        Accordingly, defendant's motion for summary judgment as to plaintiff's claims of age

15   discrimination is granted.

16   **B.**   **Alleged Disability Discrimination/Denial of Electric Cart**

17        Although the allegations appear nowhere in his complaint, plaintiff now asserts that he

18   was wrongfully denied the use of an electric cart and that this constitutes unlawful disability

19   discrimination.  Defendant contends that it is entitled to summary judgment because Gardias

20   failed to exhaust his administrative remedies.

21        "Subject matter jurisdiction extends over all allegations of discrimination that either 'fell

22   within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can*

23   *reasonably be expected* to grow out of the charge of discrimination.'"  Josephs v. Pacific Bell,

24   443 F.3d 1050, 1062 (9th Cir. 2006) (quoting B.K.B. v. Maui Police Dep't, 276 F.2d 1091,

25   1100 (9th Cir. 2002)).  Here, Gardias' complaint is based on underlying EEOC Charge No. 556-

26   2007-00687.  (See Complaint, Docket No. 1).  In that charge, plaintiff checked only the boxes

27

28         [6]   "A state employee alleging age discrimination in employment is not without a
forum altogether, because he can file an ADEA suit in state court."  Ahlmeyer, 555 F.3d at
1060 n.9.

5

United States District Court

For the Northern District of California

1   for discrimination based on "national origin," "retaliation" and "age," but did not check the box

2   for discrimination based on "disability."  (See EEOC Charge of Discrimination, No. 556-2007-

3   00687 appended to Opp. pp. 13-14).  Nor did he allege in the body of the charge any facts

4   referencing or even suggesting discrimination on that basis.  Indeed, the charge alleges only that

5   Gardias was verbally harassed by FDO Director Adam Bayer and that, after Gardias

6   complained about that incident, Bayer retaliated by giving plaintiff a negative performance

7   evaluation.  (Id.).

8          In sum, allegations as to alleged disability discrimination and denial of an electric cart

9   do not appear anywhere in either the EEOC charge or plaintiff's complaint.  Moreover, the

10  EEOC charge alleges different kinds of discrimination involving completely different specific

11  events.  Under these circumstances, the court concludes that plaintiff has not exhausted his

12  administrative remedies as to his allegations of disability discrimination or denial of an electric

13  cart.  Although the Ninth Circuit recognizes an equitable exception to the exhaustion

14  requirement when an EEOC representative misleads a plaintiff about his claim, see Josephs, 443

15  F.3d at 1061, there is nothing before the court to suggest anything of the kind here.  Indeed,

16  Gardias acknowledges that he did not say anything about disability discrimination in his EEOC

17  charge, now explaining only that it was a mistake.  (Opp. at 23).

18         Even assuming that plaintiff did exhaust his claim, he has not presented evidence

19  creating a triable issue as to any disability.  In order to establish a *prima facie* case of

20  discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.,

21  a plaintiff must demonstrate that: (1) he is disabled within the meaning of the ADA; (2) he is a

22  qualified individual able to perform the essential functions of the job with reasonable

23  accommodation; and (3) he suffered an adverse employment action because of his disability.

24  Allen v. Pacific Bell, 348 F.3d 1113, 1114 (9th Cir. 2003).  The ADA provides that a

25  "disability" is (a) a physical or mental impairment that substantially limits one or more of the

26  major life activities of such individual; (b) a record of such an impairment; or (c) being

27  regarded as having such an impairment.  42 U.S.C. § 12102(1).  Under the implementing federal

28  regulations, the term "substantially limits" means:

6

United States District Court

For the Northern District of California

1   (i) Unable to perform a major life activity that the average person in the
2   general population can perform; or (ii) [s]ignificantly restricted as to the
    condition, manner or duration under which an individual can perform a
    particular major life activity as compared to the condition, manner, or
3   duration under which the average person in the general population can
    perform that same major life activity.

4

5   29 C.F.R. § 1630.2(j)(1)(i)-(ii).

6       Here, when asked in deposition about his claimed "disability," Gardias testified that he

7   is suing for disability discrimination based on his leukemia and a knee injury he sustained in

8   1993.  (Cain-Simon Decl., Ex. 6 (Gardias Depo. at 42:25-44:20, 74)).  However, when asked

9   whether he believes that the University has discriminated against him on the basis of his

10  leukemia, Gardias testified that he believed that defendant discriminated against him only on

11  the basis of his knee injury because he did not know if anyone at the University knew he had

12  leukemia.  (Id. at 74:19-25).  Following the motion hearing, Gardias filed papers indicating that

13  defendant has known since 2005 that he has leukemia.  But this does not raise a triable fact

14  issue here because Gardias also testified that he does not consider himself to be disabled at all –

15  whether due to leukemia or his knee injury.  (Id. at 334:11-335:13).[7]

16      Plaintiff now asserts in his opposition papers that he "is weaker and has difficulty of

17  speaking occasionally" because of his leukemia and alleged work place stresses.  (Opp. at 21).

18  However, Gardias presents nothing creating a triable issue that his leukemia or knee injury

19  substantially limits him in any life activity.  See Villarimo v. Aloha Island Air, Inc., 281 F.3d

20  1054, 1061 (9th Cir. 2002) (internal quotations omitted) ("[T]his court has refused to find a

21  'genuine issue' where the only evidence presented is 'uncorroborated and self-serving

22  testimony.").  Indeed, the only evidence Gardias submits as to the effect of his medical

23  conditions on his capabilities is one page of a 2005 medical report, which indicates that (a) all

24  of his conditions are "stable," with no complications; (b) Gardias "appeared to be doing well,"

25  (c) he "demonstrated good consistency between the [functional capacity evaluation] items; and

26

27  ─────────────────

28      [7]     Plaintiff also testified that he does not consider himself to be disabled based
    on rheumatoid arthritis, a condition which he has not raised in this litigation.  (Cain-Simon
    Decl. Ex. 6 (Gardias Depo. at 334:11-335:13)).

1   (d) "was able to carry an 85 lb. box in the horizontal carry and a 75 lb box in the front carry."

2   (See Opp. at 21 and appended exhibits).

3         Defendant's motion for summary judgment as to claimed disability

4   discrimination/denial of an electric cart is granted.

5 **C.**   **Alleged National Origin Discrimination**

6         The remaining basis of Gardias' discrimination claim is that defendant made certain

7   decisions which, in his view, were motivated by discrimination against his Polish national

8   origin. According to plaintiff, that discrimination manifested itself in three ways. He resurrects

9   here his claim that he was unlawfully denied an electric cart. He also claims that he was denied

10   certain work and use of the University's Energy Maintenance System. Finally, Gardias says

11   that defendant failed to promote him to Facilities Project Supervisor and instead gave the job to

12   Kym Bersuch, an employee that Gardias contends was less qualified or unqualified for the

13   position.

14         Although it is not the court's task to scour the record in search of a genuine issue of

15   triable fact, see Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996), this court has reviewed

16   every one of plaintiff's filings in this litigation – including those made, without leave of court,

17   after briefing on this motion closed and after the matter was deemed submitted following oral

18   argument. As discussed more fully below, nowhere in the record is there even a suggestion of

19   an anti-Polish slur or that anyone ever referred to his Polish origin in a disparaging manner.

20       **1.**     **Burden of Proof**

21         Title VII prohibits employment discrimination based on, among other protected

22   classifications, a person's national origin. 42 U.S.C. § 2000e-2(a). When responding to a

23   summary judgment motion, a plaintiff may proceed by following the McDonnell Douglas[8]

24   framework, or alternatively, may produce direct or circumstantial evidence demonstrating that a

25   discriminatory reason more likely than not motivated the defendant. McGinest v. GTE Serv.

26   Corp., 360 F.3d 1103, 1122 (9th Cir. 2004).

27

28

---

[8]   McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    Under the McDonnell Douglas burden-shifting framework, a plaintiff must establish a

2 *prima facie* case of discrimination.  See Cornwell v. Electra Central Credit Union, 439 F.3d

3 1018, 1028 (9th Cir. 2006); Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir.

4 2004).  To establish a *prima facie* case of discrimination, a plaintiff must offer proof that (1) he

5 belongs to a class of persons protected by Title VII; (2) he performed his job satisfactorily; (3)

6 he suffered an adverse employment action; and (4) his employer treated him differently than a

7 similarly situated employee who does not belong to the same protected class as the plaintiff.

8 Cornwell, 439 F.3d at 1028.  Establishing a *prima facie* case creates a presumption that the

9 employer's challenged actions were made because of plaintiff's protected classification.  Id.

10    An employer may rebut this presumption by presenting admissible evidence that the

11 challenged employment action was made for a legitimate, nondiscriminatory reason.  Id.  If the

12 employer does so, the presumption of unlawful discrimination simply drops out of the picture.

13 Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005) (citing St.

14 Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L.Ed.2d 407 (1993)).  The

15 burden then shifts back to the plaintiff to show that the employer's reason is a pretext for

16 discrimination.  Cornwell, 439 F.3d at 1028-29.

17    Plaintiff bears the ultimate burden of proving discrimination.  In order to survive

18 summary judgment, the burden of proof may be met in two ways:  (1) by offering direct or

19 circumstantial evidence that the challenged employment decision was more likely motivated by

20 discrimination or (2) offering direct or circumstantial evidence that the employer's proffered

21 explanation is not credible – i.e. a mere pretext for discrimination.  Id.  "Because the only issue

22 remaining in a disparate treatment case after the defendant has rebutted the McDonnell Douglas

23 presumption is 'discrimination *vel non*,'" the Ninth Circuit has said that it is not particularly

24 significant whether a plaintiff relies on the McDonnell Douglas presumption or whether he

25 relies on direct or circumstantial evidence of discriminatory intent to meet his burden of proof.

26 Id. at 1030 (quoting McGinest, 360 F.3d at 1123)).  Under either approach, a plaintiff must

27 produce some evidence suggesting that the employer's challenged actions were due, in whole or

28 in part, to discriminatory intent.  Id.

**United States District Court**
For the Northern District of California

1    It is unclear whether, under Ninth Circuit law, circumstantial evidence must be

2    "specific" and "substantial," or whether a lesser amount of such evidence will suffice.[12]   This

3    court need not reach a conclusion as to the requisite level of circumstantial evidence, however,

4    because plaintiff's evidence of discrimination is insufficient under either standard.

5    **2.    Denial of Electric Cart**

6    Here, Gardias repackages his claim as to the denial of an electric cart as one for national

7    origin discrimination.  He says that, between 2002 and 2007, he was not assigned his own cart

8    because of his Polish national origin.  As discussed above, Gardias has not exhausted his

9    administrative remedy with respect to any claim pertaining to a cart.  Nevertheless, having

10   carefully considered the record before it, this court finds no evidence giving rise to a triable

11   issue in any event.

12   There is no dispute as to the following facts:   For a number of years during his

13   employment, plaintiff was assigned his own electric cart in the FDO department.  He

14   subsequently worked on assignment for over a year in the University's Planning, Design and

15   Construction ("PDC") department.  When he returned to his Building Service Engineer position

16   at the FDO department in or about 2002, Gardias was unhappy to find that, in his absence, his

17   old cart had been assigned to another employee.  It is not entirely clear who that employee was,

18   but the record suggests that it was a colleague named Dante.  Gardias says that he verbally

19   complained to Dante many times, saying, "Oh you are using my cart, which was given to me,

20   but I am not."  (Cain-Simon Decl., Ex. 6 (Gardias Depo. at 57:18-20)).  Gardias testified that he

21   believed that an individual cart should have been assigned to him because he had been at the

22   University the longest.  (Id. (Gardias Depo. at 52:23-53:1)).  In the meantime, plaintiff generally

23   called on his colleagues to drive him to assignments, albeit he says that his supervisor later

24

25

26   [12]    Compare Cornwell, 439 F.3d at 1030 ("conclud[ing] that in the context of
     summary judgment, Title VII does not require a disparate treatment plaintiff relying on
27   circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on
     direct evidence") and McGinest, 360 F.3d at 1122 (stating that circumstantial and direct
28   evidence should be treated alike) with Dominguez-Curry, 424 F.3d at 1038 (stating that
     circumstantial evidence of pretext must be "specific" and "substantial").

1   required all employees in his group to route calls for assistance through their respective

2   supervisors.

3          Sometime later, on March 13, 2006, Gardias sent a written request to Bayer, stating,

4   "Till now I have no electric cart.  Please inform me when I will get it."  (Cain-Simon Decl., Ex.

5   1).  Several months later, Gardias says that he sent a memo to FDO Vice President Tony

6   Valenzuela, saying that he wanted a cart because of his "illness."  Then, in August 2007,

7   Gardias sent another memo to Valenzuela, indicating that he wanted a cart "to better serve our

8   customers."  (Opp. at 6 and appended exhibits).  Sometime in or after October 2007,[13] Gardias

9   was assigned his own cart, which was taken away from another FDO employee so that it could

10  be assigned to plaintiff.  (Cain-Simon Decl., Ex. 6 (Gardias Depo. at 28:6-20)).  Gardias has had

11  his own individual cart ever since.

12         Even assuming, without deciding, that plaintiff could establish a *prima facie* case of

13  discrimination, defendant offers a legitimate, nondiscriminatory reason for its decision.

14  According to defendant, the University does not have enough carts for every FDO employee to

15  be assigned an individual cart.  Instead, FDO carts remain a shared resource which are allocated

16  according to the department's needs.  And, employees who have their own individual carts are

17  expected to share with those employees who do not.  (Crisp Decl. at 1:26-2:3, 9-11).

18  Additionally, defendant says that from 2005-2007, Gardias did not present a valid certification

19  that he had passed a defensive driving skills test – a prerequisite to the assignment of an

20  individual cart.  (Id. at 2:4-7).

21         Gardias has not submitted any evidence creating a triable issue that defendant's actions

22  were motivated by discrimination or that defendant's articulated non-discriminatory reasons are

23  pretextual.  Nor does this court find any evidence even suggesting discriminatory animus on the

24  basis of his national origin.  Instead, plaintiff argues that the claimed policy of sharing carts

25  _____

26         [13]     Defendant says that Gardias was assigned his own cart within a month after
    his August 2007 request.  (Crisp Decl. at 2:8-9).  Gardias did not recall precisely when he
27  was assigned his own cart, but testified that it was sometime in or after October 2007 or in
    early 2008.  (Cain-Simon Decl., Ex. 6 (Gardias Depo. at 28:11-12, 29:18-25); Opp. at 8).
28  For purposes of resolving the instant motion, the court does not find this discrepancy to be
    material.

1    does not apply to him because (a) he is a member of the "HVAC crew"; and (b) his supervisor,

2    Darin Adams, reportedly told all HVAC crew members to route all calls for assistance through

3    their supervisors, rather than contacting their colleagues directly.  (Opp. at 8).  But whether

4    calls for assistance go through plaintiff's supervisor, or whether such calls are made directly to

5    colleagues, Gardias' argument does not controvert the University's assertion that there simply

6    are not enough carts for everyone and that employees with carts are expected to share.

7    　　As for the alleged failure to present a valid defensive driving card, Gardias has

8    submitted a copy of a defensive driving certificate he obtained in January 2007.  He does not,

9    however, deny that his prior certificate expired over a year before in 2005.  Thus, even viewing

10   the record in the light most favorable to plaintiff, and drawing all reasonable inferences in his

11   favor, the evidence shows that (a) some eight months after obtaining a valid defensive driving

12   certificate, Gardias requested a cart of his own; (b) defendant took away another employee's

13   cart so that it could be assigned to Gardias; and (c) Gardias received his own cart within a few

14   months after his request.  Gardias seems to suggest that the delay in the assignment of his cart

15   was due to the fact that he is Polish.  However, apart from his bare assertion, there is nothing in

16   the record to support that contention.  If anything, the record shows that defendant gave plaintiff

17   precisely what he wanted (at another employee's expense) – albeit just not as promptly as

18   Gardias would have liked.  Gardias' speculation does not give rise to a genuine issue of material

19   fact as to the existence of any disparate treatment or intent to discriminate on the basis of his

20   national origin.  Accordingly, defendant's motion for summary judgment as to this issue is

21   granted.

22   　　**3.**    **Denial of Work/Use of Energy Maintenance System ("EMS")**

23   　　Gardias contends that work that was once within his job description as a Building

24   Service Engineer is now being performed by a group of employees known as Facilities Control

25   Specialists.  (Cain-Simon Decl. Ex. 6 (Gardias Depo. at 186:8-22)).  Relatedly, he complains

26   that he is permitted only limited access to the University's EMS (a system that controls the

27   heating, ventilating, air conditioning, fans and steam for the University's buildings), whereas

28   Facilities Control Specialists reportedly enjoy broader access to that system.

**United States District Court**
For the Northern District of California

12

**United States District Court**
For the Northern District of California

1    To be clear, Gardias does not want to be a Facilities Control Specialist and has never

2    applied for the position.  Indeed, although plaintiff is aware that Facilities Control Specialists

3    earn more pay than he does, and while he contends that they enjoy broader access to the

4    University's EMS, he would consider the position to be a demotion.  (Id. (Gardias Depo.

5    180:20-181:3; 185:1-17)).

6    Instead, Gardias seems to suggest that Bayer hired Facilities Control Specialists for the

7    purpose of depriving Gardias of work because of plaintiff's Polish heritage.[14]  Here, plaintiff

8    claims that throughout his 20-year employment at the University, there has never been any

9    "Facilities Control" position.  He further contends that the University is contractually obliged to

10   give certain work to him and that, by giving that work to Facilities Control Specialists,

11   defendant is violating its contractual agreement.

12   This court offers no opinion as to any purported contractual violation.  Additionally, it is

13   not clear precisely what work Facilities Control Specialists perform that Gardias claims should

14   be his.  Having reviewed the record presented, this court finds no evidence giving rise to a

15   triable issue as to any national origin discrimination.  The documents submitted by Gardias

16   himself indicate that the "Facilities Control Specialist" position was created by the California

17   State University system in 2000.  (See Opp. at 5 and appended exhibits).  There is nothing even

18   suggesting that the creation of that position or the assignment of work Gardias says is his

19   (whatever that may be) is or was motivated, in whole or in part, by any discriminatory animus.

20   As for the alleged denial of access to EMS, there is no evidence that plaintiff was

21   unfairly denied access to that system, much less that the alleged denial of access interfered with

22   the performance of his job duties.[15]  Indeed, the only thing that can be distilled from his

23   _____

24       [14]     In this portion of his opposition, Gardias resurrects arguments about certain
         positions which he claims should have been his, but which the University gave to other
25       individuals who allegedly were less qualified.  The court does not address these arguments
         here, except to say that all of them have been dealt with, and disposed of, in this court's order
26       on defendant's motion for summary judgment in consolidated case Gardias v. San Jose State
         University, C04-04086.
27

28       [15]     The lack of such evidence leads the court to wonder whether Gardias'
         dissatisfaction is simply a matter of ego and prestige.  As noted above, plaintiff considers
         Facilities Control Specialists to be beneath him, but believes that they have greater access to

13

United States District Court

For the Northern District of California

1   opposition as to the basis for this allegation is this:  Several years ago, Gardias was encouraged

2   by his supervisors to learn more about the functions of EMS.  Instead of asking to be trained,

3   however, Gardias decided to train himself.  He then simply demanded that Scott Anderson (a

4   supervisor in the FDO department) give him the password for the entire system for self-training

5   purposes.  Anderson declined to do so, fearing that the uncontrolled use of the system, in

6   untrained hands, could potentially have wreaked havoc.[16]  Gardias now asserts that defendant

7   continues to "follow[] Scott Anderson's lead" by denying him access to EMS.  (Opp. at 10 and

8   appended exhibits).  But the sole basis for this contention is that his 2007 performance review

9   evaluates his performance as to, among other things, "Emergency response & preparedness"

10  and "Preventive Maintenance," but does not specifically mention the term "EMS."  (Id.).  On

11  the record presented, the court finds no evidence giving rise to a genuine issue of material fact

12  that plaintiff was unfairly denied access to EMS or that any such denial was due to any national

13  origin discrimination.

14        Defendant's motion for summary judgment as to this issue is granted.

15        **4.        Failure to Promote**

16        Plaintiff says that "SJSU assigned my colleague to Facilities Supervisor Position

17  contrary to my Director Adam Bayer's written statement that I should be in a position to mentor

18  other staff."[17]  (Complaint at 2, Docket No. 1).  The colleague in question is Kym Bersuch.

19  Gardias says that there was no open competition for the Facilities Supervisor position, and the

20  job was simply given to Bersuch.  Plaintiff contends that he was never given an opportunity to

21  apply for the position because of his Polish national origin.

22  _____

23  and control over EMS.

24        [16]     This incident was one of the subjects of plaintiff's prior consolidated lawsuit,
    in which Gardias claimed that Anderson's denial of the EMS password was unlawful

25  discrimination.  As noted above, this court granted summary judgment in defendant's favor
    as to all claims asserted in that consolidated action.

26        [17]     Gardias apparently is referring here to his performance review for the period
    April 1, 2006 to March 31, 2007.  In it, Bayer commented: "I would like to see Piotr work

27  more independently.  As a senior staff with the experience Piotr has, I would expect he
    would be in a position to mentor other staff, and although this is not a requirement of the

28  position it does reflect on the morale of every member in the department."  (Opp.
    Introduction and appended exhibits).

1    Once again, even assuming, for the sake of argument, that Gardias could establish a

2    *prima facie* case of discrimination, defendant articulates a legitimate, nondiscriminatory reason

3    for its decision:   Based on Bersuch's work with the University's "TMA" group (a team that

4    assisted with the implementation of a software application for tracking facilities-related work

5    orders), Director of Administrative Services Terry Crisp (who chaired the TMA Group)

6    concluded that Bersuch had the requisite technical and operational expertise, and good

7    interpersonal and communication skills, for the Facilities Project Supervisor position.  Crisp

8    recommended Bersuch, and actively recruited him for the job.  (Crisp Decl. at 2:12-3:2).

9    Gardias presents nothing but sheer speculation as to any discriminatory animus or

10    pretext.  In his opposition, plaintiff denies having testified that he is more qualified for the

11    Facilities Supervisor position because he has advanced degrees and Bersuch does not.  Instead,

12    Gardias says that the job should have been given to him because in March 2007, he (along with

13    29 other members of the University's Energy Conservation Program Development and

14    Execution Team) received a special award from the University (i.e., a $250 "Gold Points" card

15    for the employee's choice of food or merchandise from University shops) for performing above

16    and beyond what is expected.  (Opp. at 16 and attached exhibit).  He also presents a memo,

17    reportedly written by Bersuch in 2002 (i.e., some five years before the time period encompassed

18    by the complaint), in which Bersuch suggested that Gardias might be considered for a

19    "Faculties Project Supervisor" position.  On these bases, plaintiff argues that he was not given

20    the Facilities Supervisor position because of his Polish heritage.  Having carefully reviewed the

21    entire record, this court finds nothing in it that raises a genuine issue of material fact as to any

22    national origin discrimination with respect to the job he claims should have been his.

23    Defendant's motion for summary judgment as to this issue is granted.

24    **D.    Alleged Harassment**

25    Title VII's prohibition against unlawful employment practices "encompasses the

26    creation of a hostile work environment, which violates Title VII's guarantee of 'the right to

27    work in an environment free from discriminatory intimidation, ridicule, and insult.'"  McGinest,

28    360 F.3d at 1112 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399,

United States District Court
For the Northern District of California

15

United States District Court

For the Northern District of California

91 L.Ed.2d 49 (1986)).  To prevail on a hostile work environment claim, Gardias must show that his work environment was both subjectively and objectively hostile – that is, he must show that he perceived his work environment to be hostile, and that a reasonable person in his position would perceive it to be so.  Dominguez-Curry, 424 F.3d at 1034.  In determining whether the alleged conduct created an objectively hostile work environment, the court evaluates "all the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Id. at 1034 (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71, 121 S. Ct. 1508, 149 L.Ed.2d 509 (2001)).  "'Simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998)).

Here, Gardias claims that he was "verbally harassed, mocked and publicly humiliated." (Complaint at 2, Docket No. 1).  The allegation stems from a May 30, 2007 incident in which Gardias says that Bayer angrily called him a "grown man."  Specifically, plaintiff says that during a meeting, he asked Bayer for an organizational chart for the University.  Bayer allegedly responded "with angry voice, 'Peter, you are a grown man, you should be able to find this information on the interne[t] on your own.'"  (Opp. at 12).  Additionally – although the allegations appear nowhere in his complaint – in his opposition papers, Gardias now complains about other purported incidents he is aggrieved over, including (a) a supposed comment by Bayer in August 2007 when Bayer reportedly told plaintiff to retire, but then later recanted; (b) Bayer's purported direction to Gardias to report for a psychiatric evaluation, which apparently never happened and was not pursued; (c) an alleged incident in late 2007 when Bayer reportedly could not be bothered to speak with Gardias and allegedly "yelled at [plaintiff] to go back to work"; and (d) at some point in time, Bayer allegedly called plaintiff's colleague and previous supervisors "stupid."  (Opp. at 11; see also Docket No. 16 at 2).

United States District Court
For the Northern District of California

1   Several of these allegations are repeats of hostile work environment/harassment claims

2   that this court has addressed, and disposed of, in Gardias' prior lawsuits.  He has added

3   somewhat more detail about some of the alleged incidents this time around.  But, while this

4   court does not condone what may be Bayer's rude behavior, it also does not find a triable issue

5   here.  Title VII "does not set forth 'a general civility code for the American workplace.'"

6   Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345

7   (2006) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998,

8   140 L.Ed.2d 201 (1998)); Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003)

9   (quoting Faragher, 524 U.S. at 788).  Even viewing the record in the light most favorable to

10   plaintiff, these isolated and random events are, for the most part, nonactionable petty slights –

11   and are, in any event, not severe or pervasive enough to violate Title VII.  See, e.g., Vasquez,

12   349 F.3d at 642-44 (concluding that defendant's few comments about Hispanics and other

13   alleged harassment, made over the course of more than one year, did not create a hostile work

14   environment).  Defendant's motion for summary judgment as to plaintiff's harassment claim is

15   granted.

16   **E.    Alleged Retaliation**

17   Title VII prohibits an employer from retaliating against an employee because that

18   employee has opposed an unlawful employment practice, or has made a charge, testified or

19   assisted or participated in an employment discrimination investigation or proceeding.  42 U.S.C.

20   § 2000e-3(a).  The same burden-shifting analysis that applies to claims for discrimination also

21   apply to retaliation claims under Title VII. To make a *prima facie* case of retaliation, a plaintiff

22   "must establish that he undertook a protected activity under Title VII, his employer subjected

23   him to an adverse employment action, and there is a causal link between those two events."

24   Vasquez, 349 F.3d at 646.

25   "The anti-retaliation provision protects an individual not from all retaliation, but from

26   retaliation that produces an injury or harm."  White, 548 U.S. at 67.  Thus, an "adverse action,"

27   for purposes of a Title VII retaliation claim, requires a showing that "a reasonable employee

28   would have found the challenged action materially adverse" – i.e., that the action "well might

17

**United States District Court**
For the Northern District of California

1    have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

2    Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "Context

3    matters," however, and whether a particular challenged action is materially adverse will depend

4    upon the particular circumstances presented.  Id. at 69.  The "standard for judging harm must be

5    objective. . . . It avoids the uncertainties and unfair discrepancies that can plague a judicial

6    effort to determine a plaintiff's unusual subjective feelings."  Id.

7         In his complaint, Gardias alleges that Bayer gave him "a negative performance

8    evaluation because of my previous discrimination complaints."  (Complaint at 2, Docket No. 1).

9    The specific focus of his unhappiness is his employee evaluation for the period April 1, 2006 to

10   March 31, 2007 in which his overall performance rating was "Not Satisfactory – meets some,

11   but not all expectations."  (Opp. and attached exhibits).  Among other areas for improvement,

12   Bayer remarked that Gardias needed to ensure that charges are appropriately applied to correct

13   work orders, noting that there had been past problems with filters for multiple buildings being

14   placed on a single work order.  (Id.).  Additionally, Bayer commented that Gardias needed to

15   improve his communication with management, observing that plaintiff had refused to talk to his

16   managers without Union representation, making it difficult for his supervisors to provide

17   direction about service calls or assigned work.  (Id.).

18        On the record presented, there is no dispute that plaintiff's previous EEOC complaints

19   span several years, with the last being made over a year before the performance evaluation in

20   question.  See Villiarimo, 281 F.3d at 1065 (citing cases indicating that intervals ranging from

21   four months to one year is too long to raise an inference of retaliation).  Nor can the evaluation

22   be retaliation for Gardias' complaint to the University's Human Resources ("HR") department

23   about Bayer calling him a "grown man."  The record shows that Bayer signed plaintiff's

24   evaluation on June 1, 2007, three days *before* Gardias filed his complaint with the HR

25   department on June 4, 2007.  (See Opp. and appended exhibits).

26        Gardias' opposition now indicates that he is not referring to either his previous EEOC

27   complaints or his June 4, 2007 complaint to HR about being called a "grown man."  Instead, he

28   says that (a) he challenged his employee review on June 7, 2007 and (b) Bayer retaliated by

degrading him on June 13, 2007. Defendant says that plaintiff (like all University employees) has the right to challenge his employee review. It contends that there is nothing to suggest any retaliation, and further argues that the objective facts surrounding the evaluation do not establish a causal connection between Gardias' review and any protected activity he might have undertaken.

Indeed, the length of time between a protected activity and an adverse employment action is not to be considered "without regard to its factual setting." Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003). Here, the factual setting indicates that Gardias received his employee review on June 4, 2007. Several days later, on June 7, 2007, he sent an email to Bayer and supervisors Bob Felice and John Morse, stating his disagreement with various aspects of his evaluation. (Cain-Simon Decl. Ex. 3). Among other things, Gardias believes that he should have been given the highest rating of "10" for his job knowledge and skills because of the $250 "Gold Points" award card he and the University's Energy Conservation Program Development and Execution Team received in March 2007. (Id.).

Plaintiff now says that Bayer degraded his job performance on June 13, 2007 in retaliation for asserting objections to the employee review. (Opp. at 13). However, the papers submitted by plaintiff show only that on June 13, 2007, plaintiff reportedly met with Bayer, Felice and Morse to discuss his objections to his review. The discussion at the meeting supposedly involved (a) multiple filters being placed on a single work order; (b) plaintiff's alleged refusal to speak with management without a Union representative; and (c) Bayer's desire to see plaintiff mentor other staff. According to Gardias, Bayer allegedly said that (a) the observation about plaintiff's refusal to speak directly with management was based on events that occurred after April 2006; and (b) Bayer sent him "two or four" letters about those matters. (Opp. at 13 and attached exhibits). Plaintiff contends that the management/communication issue is a "made-up false story to degrade plaintiff's performance" because he says that the "two or four" letters do not exist. (Id. at 13, 17).

Gardias has not presented evidence creating a triable issue as to whether his evaluation was retaliatory. The Ninth Circuit has held that "undeserved performance ratings, if proven,

19

United States District Court

For the Northern District of California

1    would constitute 'adverse employment decisions.'" Ray v. Henderson, 217 F.3d 1234, 1241

2    (9th Cir. 2000) (quoting Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (emphasis

3    added).  With respect to the issue of charges being appropriately applied to correct work orders,

4    plaintiff initially denied that this happened, claiming that "[p]robably there were not written

5    instructions from [Bayer] or vague and ambiguous verbal direction." (Cain-Simon Decl. Ex. 3

6    at AGO-1822).  Plaintiff now says that his colleague, Leroy Barnette, ordered filters in January

7    2007 and that there was no "transgression in procedures." (Opp. at 16).  In deposition,

8    however, he acknowledged that filters for multiple buildings had been placed on a single work

9    order, but said that it was not his fault because he had delegated responsibility to Leroy for the

10   paperwork on a particular job.  (Cain-Simon Decl. Ex. 6 (Gardias Depo. at 125:1-126:14,

11   129:12-14)).  Then, Gardias testified that Leroy did nothing wrong and that Bayer had lied

12   about the work order issue.  (Id. at 127:17-22).  Still later, Gardias testified that Leroy had all

13   responsibility for the paper work in the first instance.  (Id. Ex. 6 (Gardias Depo. at 131:6-

14   132:25)).  Plaintiff's inconsistent explanations do not create a triable fact issue as to whether

15   Bayer's comment as to the need for improved record-keeping was unwarranted.[18]

16           As for Bayer's observation about plaintiff's communication with management, Gardias

17   has presented no evidence creating a triable issue here either.  As discussed above, plaintiff now

18   claims that Bayer's evaluation was based on "tremendous lies" – apparently because Gardias

19   says he cannot find the "two or four letters" Bayer reportedly sent him.  (Opp. at 17).  But the

20   fact remains that in his June 7, 2007 objections to his evaluation, plaintiff did not factually

21   dispute Bayer's observation that he has been unwilling to communicate directly with

22   management.  Gardias claimed only that he had a "bad experience" with administrators and had

23   "a right to be afraid of [them], without Union representation."  (Cain-Simon Decl., Ex. 3 at

24   AGO-1822-23).

25

26   ───────────────

27       [18]    As defendant points out, Gardias even seems to challenge the positive
         comments in his evaluation.  For example, when asked in deposition about the observation
28   "'Piotr has a good attendance record,'" Gardias responded, "I don't know what he's talking
         about. . . . Attendance to whom, to what?  What he's talking about/" (Cain-Simon Decl. Ex. 6
         (Gardias Depo. at 120:7-18)).

**United States District Court**
For the Northern District of California

1   Although it appears nowhere in his complaint, Gardias makes a fleeting reference in his

2   opposition to a letter he sent to the University's HR department, in which he summarily asserts

3   that the alleged denial of access to EMS (i.e., discussed above in connection with Gardias'

4   dissatisfaction with Facilities Control Specialists) is retaliation.  As discussed above, Gardias

5   has not presented evidence creating a triable issue that he was wrongfully denied EMS access,

6   much less that any alleged denial was done in retaliation for some protected activity.

7   Defendant's motion as to plaintiff's claims of unlawful retaliation is granted.

8   **F.      Betty Luna's Declaration**

9   In his complaint, Gardias says, "I learned from my previous Director Betty Luna that

10  SJSU chose applicants not qualified for positions I applied for."  (Complaint at 2, Docket No.

11  1).  It is now evident that he is referring here to Luna's declaration submitted in support of

12  defendant's summary judgment motion filed in Gardias' separate consolidated lawsuit, Case

13  No. C04-04086.  In it, Luna (the University's Director of Facility Operations) says that she is

14  familiar with the requirements for each of the positions Gardias sought, and in her opinion (a)

15  Gardias lacks the requisite skills and (b) she would not have recommended him for any of the

16  jobs at issue in that litigation.

17  Gardias has submitted another copy of Luna's declaration to this court in the instant

18  lawsuit and now contends that the declaration proves that the University hired unqualified

19  individuals for positions at issue in that other litigation.  He also argues that the declaration

20  establishes that he should have been appointed to the Facilities Supervisor Position that was

21  given to Bersuch.  Defendant contends that Gardias has not stated a cognizable claim for relief,

22  and that in any event, Luna's statements are protected by the litigation privilege under

23  California Civil Code § 47(b).

24  It is not clear whether Gardias is attempting to state a separate claim for relief based on

25  Luna's declaration (if so, it is not clear what the claim is) or whether he is simply citing the

26  declaration as evidence of the claims discussed above.  Either way, this court sees no need to

27  belabor the issue any further.  Suffice to say that this court considered Luna's declaration –

28  along with all other matters of record in Gardias' separate consolidated lawsuit – and concluded

1    that there was no triable issue as to the positions at issue in that litigation.  The court has again

2    reviewed Luna's declaration here and finds that it raises no triable issue as to any claim Gardias

3    has asserted in the instant lawsuit.

4         Defendant's motion for summary judgment as to this issue is granted.

5                                        **IV.  ORDER**

6         Based on the foregoing, defendant's motion for summary judgment is GRANTED.  The

7    clerk shall enter judgment and close the file.

8         SO ORDERED.

9    Dated:    September 17, 2009

10                                        _____
                                          HOWARD R. LLOYD
11                                        UNITED STATES MAGISTRATE JUDGE

**United States District Court**

For the Northern District of California

22

1   **5:07-cv-6242 Notice has been electronically mailed to:**

2   Mary Susan Cain-Simon Mary.CainSimon@doj.ca.gov, Leticia.MartinezCarter@doj.ca.gov

3   **Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program**.

4

5   **5:07-cv-6242 A copy of this document mailed to:**

6   Piotr J. Gardias
    72 Floyd St.
7   San Jose, CA 95110

8          Pro Se Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California